UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BENJAMIN MITCHELL,

                              Petitioner,

        – versus –

DAVID ROCK, Superintendent, Upstate
Correctional Facility,

                              Respondent.

MEMORANDUM
AND ORDER

11-CV-2642 (JG)

APPEARANCES:

        LEVITT & KAIZER
                40 Fulton Street, 23rd Floor
                New York, New York  10038
        By:     Richard Ware Levitt
                *Attorneys for Petitioner*

        RICHARD A. BROWN
                Queens County District Attorney
                125-01 Queens Boulevard
                Kew Gardens, New York  11415
        By:     Anastasia Spanakos-Orfan
                Assistant District Attorney
                *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

        Benjamin Mitchell, who is currently incarcerated at Upstate Correctional Facility,

petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Mitchell was

convicted after a three-day jury trial of first degree robbery, first degree assault, and criminal

possession of a weapon in the second degree, and sentenced to 12 years of imprisonment.  He

brings this petition for habeas relief, alleging, *inter alia*, that the evidence presented at trial was

insufficient to support his robbery and assault convictions, the prosecutor committed misconduct,

and he received ineffective assistance of counsel during plea negotiations and trial.  For the

reasons set forth below, Mitchell's petition is denied.

BACKGROUND

A.    *The Facts*

1.    *The Robbery*

The state presented evidence of the following facts at trial.  On January 31, 2006,

at 8:00 or 9:00 A.M., Mitchell called Richard Stryker, a friend and former real estate colleague,

and asked to meet with him "about some business."  Tr. 221-23, 284-85 (Stryker Test.).[1]  They

made an appointment to meet at Stryker's office later that day at 12:00 P.M.  Tr. 222-23, 284

(Stryker Test.).  Stryker left his house at about 10:30 or 11:00 A.M. that morning, accompanied

by his wife, Genevieve, and their five-year-old child; upon exiting the house, they discovered a

green minivan blocking their driveway.[2]  Tr. 223-26 (Stryker Test.), 407 (G. Stryker Test.).  The

occupants of the minivan were not immediately visible because they had reclined their seats

back.  Tr. 223, 283 (Stryker Test.).  Stryker motioned or waved for the van to move, at which

point the individual in the passenger seat brought his seat up, and Stryker recognized him as

Mitchell.  Tr. 224, 283 (Stryker Test.).  Neither Stryker nor his wife recognized the driver of the

minivan.  Tr. 227 (Stryker Test.), 407 (G. Stryker Test.).

Mitchell exited the minivan and greeted Stryker and his wife and child.  Tr. 226,

283 (Stryker Test.), 414 (G. Stryker Test.).  According to Stryker's wife Genevieve, Mitchell

behaved normally and greeted her and the child the same way he had on previous occasions.  Tr.

---

[1]    I will use "Tr." to denote the trial transcript, which is part of the state court record filed at ECF
No. 8.

[2]    Stryker initially described the minivan as the color gray, Tr. 225 (Stryker Test.), but the prosecutor
and Stryker later referred repeatedly to the minivan as the color green, *see, e.g.* Tr. 225, 227 (Stryker Test.).  Stryker
had noticed the minivan outside of his house for about two hours that morning.  Tr. 223 (Stryker Test.).  In addition,
the Strykers' doorbell had rung about twice that morning, but neither Stryker nor his wife answered it because they
weren't expecting anyone.  Tr. 283 (Stryker Test.), 415 (G. Stryker Test.).

414 (G. Stryker Test.).  After a few minutes, Stryker asked Mitchell, "Don't we have a meeting at the office at 12?," and Mitchell responded, "I really need to speak to you urgently."  Tr. 226 (Stryker Test.).  Mitchell, who was carrying a black attaché case, asked to ride in Stryker's car to the office, and Stryker agreed.  Tr. 226, 284 (Stryker Test.).  Mitchell got into the passenger's seat of Stryker's car, a burgundy BMW X5 SUV, and they drove off toward Stryker's office.  Tr. 226 (Stryker Test.), 408 (G. Stryker Test.).  The green minivan followed them.  Tr. 409 (G. Stryker Test.).

Stryker's house was located at 215th Street and 99th Avenue in Queens.  Tr. 220 (Stryker Test.).  As Stryker drove along 99th Avenue towards his office, Mitchell began talking about a real estate transaction they had been involved in about a year before and claimed that he was entitled to more proceeds from that transaction.  Tr. 259-60, 286 (Stryker Test.).  Mitchell's tone was "very hostile" and his behavior "erratic;" he was "screaming and yelling" and seemed incapable of having a "decent conversation."  Tr. 228 (Stryker Test.).  Stryker tried to calm Mitchell down and said to him, "What are you talking about?  Nobody owes you any money."  Tr. 228 (Stryker Test.).  Mitchell pulled a pen and pad out of his briefcase as if he were about to calculate some numbers, but didn't calculate anything and just started "raging" in the car.  Tr. 287-88 (Stryker Test.).

Suddenly, Mitchell pulled a gun out of the attaché case and shot Stryker in the right arm.  Tr. 228-29 (Stryker Test.).  Stryker asked Mitchell, "Ben, did you shoot me?  Why did you shoot me?," and Mitchell started "ranting and raving" and said, "Listen, I need money."  Tr. 229 (Stryker Test.).  Stryker recognized that "there was no point in talking to him," and he broke the cross off his rearview mirror and started praying.  Tr. 241-42 (Stryker Test.).  Despite the gunshot wound to his arm, Stryker was able to pull the car over to the side of the road at

around 195th Street and 99th Avenue.  Tr. 229 (Stryker Test.).  At that time, Mitchell pushed

Stryker to the side and took from his right back pocket his wallet, which contained about $400.

Tr. 230, 235 (Stryker Test.).  Mitchell also took Stryker's gold watch from his left hand and a

$3,000 African bracelet from his right hand.  Tr. 230 (Stryker Test.).  Then Mitchell cursed

Stryker and threatened to kill him if he called the police.  Tr. 229, 231, 235, 291-92, 295 (Stryker

Test.).  Mitchell told Stryker that he had about 10 or 15 days to come up with $30,000 or

$40,000 and got out of the car.  Tr. 231-32 (Stryker Test.).  Mitchell walked to the green

minivan, which had followed them from Stryker's house and was waiting behind Stryker's car.

Tr. 232 (Stryker Test.).  Mitchell climbed into the minivan, which made a U-turn on 99th

Avenue and drove in the direction of Stryker's house.  Tr. 232 (Stryker Test.).

Stryker then restarted the car.  Tr. 240-41 (Stryker Test.).  The keys had fallen

into the ashtray while the car was parked, and Stryker used his left hand to pick up the keys and

to guide his right hand to restart the car.  Tr. 241 (Stryker Test.).  Stryker drove approximately

six to eight blocks to 188th Street and Jamaica Avenue, a busy intersection.  Tr. 243, 298

(Stryker Test.).  He drove to this location to get away from where Mitchell had shot him and to

be surrounded by people if Mitchell tried to find him.  Tr. 243, 298 (Stryker Test.).

Stryker called 911 from his cell phone as he drove to 188th Street and Jamaica

Avenue.  Tr. 240-43, 297-300 (Stryker Test.).  Eventually an ambulance arrived and transported

Stryker to Mary Immaculate Hospital.  Tr. 244-45 (Stryker Test.), 350 (Brunner Test.), 400-01

(Weichbrod Test.).  The bullet had shattered Stryker's upper right arm bone, then exited his arm

and entered his chest wall, where fragments of the bullet lodged within an inch of Stryker's lung.

Tr. 202-05 (Denton Test.).  Stryker received treatment at the hospital for two days.  Tr. 247-49

(Stryker Test.).

Stryker initially told the police and hospital personnel that he did not know who shot him. Tr. 309 (Stryker Test.). He said that the perpetrator had jumped into his car while he was stopped at a light, and described the perpetrator as an approximately 30-year-old black male, 5'6", wearing jeans and an orange-yellow t-shirt, with a mustache and short crew cut. Tr. 261, 306-09 (Stryker Test.), 395 (Culpeper Notes).[3] Stryker testified at trial that he was initially afraid to reveal that Mitchell was the perpetrator because Mitchell had threatened to kill him if he told the police. Tr. 261, 309 (Stryker Test.). But later that afternoon, at the hospital, Stryker told Detective George Negron that Mitchell had shot him. Tr. 262 (Stryker Test.), 382-83 (Negron Test.). Stryker said that he decided to identify Mitchell because Negron convinced him that he and his family were safe at that point. Tr. 262 (Stryker Test.).

Stryker testified at trial that he and his family had since moved from Queens County to Nassau County. Tr. 219 (Stryker Test.). He said he was reluctant to reveal his new location "for security reasons." Tr. 219 (Stryker Test.). Stryker's wife, Genevieve, testified that they had moved from 215th Street because they "were scared." Tr. 412 (G. Stryker Test.). She further testified that Stryker had moved his office because "[h]e didn't feel safe anymore." Tr. 413 (G. Stryker Test.).

2. *The Real Estate Deal between Stryker and Mitchell*

Stryker and Mitchell had become friends approximately six or seven years prior to Mitchell's trial, when the two of them were working together at Century 21 People's Services ("Century 21"), a real estate company. Tr. 221, 272-75 (Stryker Test.). They overlapped at

---

[3] Detective Culpeper, who responded to the scene and recorded this description in his notes, was unavailable at trial. These notes were stipulated to and read at trial. Tr. 394-95 (Culpeper Notes). Culpeper's partner, Detective George Negron, testified at trial that the notes were in Culpeper's handwriting. Tr. 390 (Negron Test.).

Century 21 for only a short time, as Mitchell was fired a few months after Stryker started.[4]  Tr. 272 (Stryker Test.).  Nonetheless, they continued their friendship and business relationship.  Tr. 222, 272-75 (Stryker Test.).  Their business relationship consisted of Stryker's regularly referring rental business to Mitchell, and two real estate deals they conducted together.  Tr. 273-74 (Stryker Test.).

One of these real estate deals was the transaction Mitchell was referring to while in the car with Stryker on January 31, 2006.  Stryker had been looking to sell a two-unit residential building located at 1032 Sterling Place, in Crown Heights, Brooklyn, that he had purchased at a foreclosure sale.  Tr. 250-51 (Stryker Test.).  Mitchell recommended a buyer named Shawn Bostick, who was unknown to Stryker.  Tr. 252 (Stryker Test.), 313 (Bostick Test.).  The men conceived of a plan in which Bostick would take out a mortgage to pay for the building, then lease the property back to Stryker.  Tr. 252 (Stryker Test.), 314 (Bostick Test.).  Stryker and Mitchell would then jointly manage the property – by renting out the units and paying the mortgage and other expenses directly – and share the profits between them.  Tr. 253, 255-57 (Stryker Test.), 316 (Bostick Test.).  After about a year, the property would be sold again and taken out of Bostick's name.  Tr. 314 (Bostick Test.).  Bostick agreed to the deal for a payment up-front.  Tr. 314 (Bostick Test.).  He also saw it as an opportunity to rehabilitate his credit through the monthly mortgage payments that would be made in his name.  Tr. 314 (Bostick Test.).

On March 8, 2005 Bostick purchased the property from Stryker and immediately leased it to Stryker.  Tr. 315 (Bostick Test.).  Stryker paid Bostick either $10,000 (according to Stryker), Tr. 255-56 (Stryker Test.), or $7,000 (according to Bostick) for his role in the

---

[4]     The reason for Mitchell's firing does not appear in the record.  Stryker was also terminated from Century 21, based on allegations of sexual harassment by his secretary.  Tr. 272-73 (Stryker Test.).

transaction, Tr. 313-15 (Bostick Test.). Stryker paid Mitchell a $15,000 "finder's fee." Tr. 255-25 (Stryker Test.). Stryker made an $80,000 gross profit on the sale, which, after expenses, amounted to a net profit of $35,000 or $40,000. Tr. 260, 276 (Stryker Test.). Mitchell was charged with renting out the units and overseeing the day-to-day operations; Stryker was to assist with management of the property. Tr. 253 (Stryker Test.), 315-16 (Bostick Test.). Mitchell moved into the property and set up an office. Tr. 256 (Stryker Test.).

The deal subsequently fell apart. Stryker claimed that Mitchell was renting out the rooms to prostitutes. Tr. 256-57 (Stryker Test.). Expenses, such as water and electric bills, went unpaid and the mortgage fell into arrears. Tr. 258 (Stryker Test.), 317, 323-25 (Bostick Test.). Bostick and Stryker attempted repeatedly to resolve the situation by speaking with Mitchell, but to no avail. Tr. 257-59 (Stryker Test.), 317 (Bostick Test.). In October 2005, Bostick finally collected some rent himself from tenants in the building, but had to put all the money toward utilities.[5] Tr. 322-23 (Bostick Test.). Stryker and Bostick also tried to resell the building, but according to Stryker, Mitchell refused to move out and would not let potential buyers examine the building. Tr. 258-59, 280-81 (Stryker Test.). Despite a belated payment of about $13,000 by Mitchell in July 2005 (and perhaps another $3,500 soon thereafter), the building went into foreclosure in November 2005. Tr. 258, 279 (Stryker Test.), 319, 323-24, 331-32 (Bostick Test.).

B.      *Mitchell's Conviction and Sentencing*

Mitchell was charged with three counts of robbery in the first degree (under three different legal theories), one count of assault in the first degree, and one count of criminal

---

[5]      Mitchell's trial lawyer was able to elicit testimony from Bostick at trial that Mitchell was hospitalized sometime in the fall of 2005. Tr. 334-35 (Bostick Test.). Specifically, Mitchell's lawyer asked Bostick whether he knew that Mitchell was hospitalized for cancer around September or October 2005; Bostick replied that he knew Mitchell had been hospitalized and "had some issues" in the fall of 2005. Tr. 334 (Bostick Test.).

possession of a weapon in the second degree. Tr. 191-93, 509. On June 25, 2007 the jury announced a verdict of guilty on all counts. Tr. 509. On August 27, 2007 the Supreme Court of Queens County imposed a sentence of 12 years on each of the three counts of robbery and the assault charge, and 5 years on the weapons charge, all to run concurrently. Sentencing Tr. 11.[6] Mitchell filed a motion to set aside the verdict pursuant to New York Civil Practice Law ("NYCPL") § 330.30 after trial, which the court summarily denied at sentencing. Sentencing Tr. 10.

Mitchell, with the aid of new counsel, appealed his convictions to the Appellate Division of the Supreme Court of New York, Second Department. His brief raised four arguments on appeal: (1) the robbery conviction was against the weight of the evidence and not proven beyond a reasonable doubt; (2) ineffective assistance of trial counsel; (3) prosecutorial misconduct; and (4) excessive sentence. *See* Def's App. Br. at ECF No. 8 at 1-36. The Appellate Division affirmed the convictions on March 16, 2010. *People v. Mitchell*, 895 N.Y.S.2d 872 (N.Y. App. Div. 2010). On June 10, 2010 the New York Court of Appeals denied Mitchell's application for leave to appeal. *People v. Mitchell*, 15 N.Y.3d 754 (N.Y. 2010) (Pigott, J.).

C.    *The Present Petition*

Mitchell filed the instant petition on May 3, 2011.[7] *See* Pet. at 29, ECF No. 1. Construing Mitchell's petition liberally, it raises six primary claims: (1) the evidence was insufficient to support his convictions for robbery and assault; (2) prosecutorial misconduct; (3) the suppression of evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (4) excessive sentence; (5) ineffective assistance of counsel during plea negotiations; and (6) ineffective

---

[6]    The sentencing transcript is filed at ECF No. 8-3 at 98-110.

[7]    Under the "prison mailbox" rule, a *pro se* prisoner's habeas petition is deemed filed at the moment he gives it to prison officials for forwarding to the court. *See Noble v. Kelly*, 246 F.3d 93, 97-98 (2d Cir. 2001).

assistance of counsel at trial. I heard oral argument on the petition on December 6, 2011. Mitchell appeared by video conference.

       1.     *Order Staying the Petition*

       Mitchell informed the Court prior to oral argument on December 6, 2011 that he had filed a motion to vacate his judgment of conviction pursuant to NYCPL § 440.10. Letter from Mitchell to J. Gleeson, Nov. 7, 2011, ECF No. 11. Mitchell's motion addressed his claims of ineffective assistance of counsel during plea negotiations and at trial. § 440.10 Motion, ECF No. 21-6. On December 6, 2011 I issued an order staying the petition and holding it in abeyance pending exhaustion of Mitchell's unexhausted claim of ineffective assistance of counsel during plea negotiations. Order Staying Case, Dec. 6, 2011, ECF No. 14. I also appointed counsel for Mitchell pursuant to the Criminal Justice Act, 18 U.S.C. § 3006(A). *Id.*

       On June 6, 2012 the Supreme Court of Queens County granted an evidentiary hearing "to determine [*inter alia*] the issues surrounding defendant's allegations that he was not advised of the plea offer." Order, June 6, 2012, ECF No. 21-2. On January 14, 2013 the court denied Mitchell's § 440.10 motion. Decision and Order, *People v. Mitchell*, No. 1726-06 (N.Y. Sup. Ct. Jan. 14, 2013), ECF No. 21-3.

       On May 10, 2013 Mitchell filed a motion to lift the stay of his habeas petition and to submit supplemental briefing in light of the § 440.10 proceedings. Mot. Reopen Case, ECF No. 19. I granted Mitchell's motion on May 14, 2013. Order, May 14, 2013. I heard supplemental oral argument on August 6, 2013.

## DISCUSSION

A.      *Legal Standards*[8]

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

federal habeas relief is available when "a person in custody pursuant to the judgment of a State

court . . . is in custody in violation of the Constitution or laws or treaties of the United States."

28 U.S.C. § 2254(a).

1.      *Exhaustion*

The exhaustion requirement, codified at 28 U.S.C. §§ 2254(b) and (c), obligates a

federal habeas petitioner to exhaust state judicial remedies before seeking relief from a federal

court.  To exhaust state remedies, a petitioner must "fairly present" his federal constitutional

claims to the highest state court with jurisdiction over them.  *Duncan v. Henry*, 513 U.S. 364,

365 (1995) (internal quotation marks and alterations omitted); *Daye v. Attorney General of New

York*, 696 F.2d 186, 191 (2d Cir. 1981) (*en banc*).  This requirement, which "springs primarily

from considerations of comity" between the federal and state systems, affords the state system

"the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."

*Daye*, 696 F.2d at 191.

When a petition presents both exhausted and unexhausted claims, a federal court

may stay the petition and hold it in abeyance to give the petitioner an opportunity to exhaust all

---

[8]      Because neither party has suggested that it is in dispute, I do not address the timeliness of
Mitchell's petition.  As part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress
enacted a one-year statute of limitations for federal habeas corpus petitions brought by state prisoners.  *See* 28
U.S.C. § 2244(d)(1).  This limitations period runs from "the date on which the judgment became final by the
conclusion of direct review or the expiration of the time for seeking such review."  *Id.* § 2244(d)(1)(A).  When a
defendant does not file a petition for certiorari with the Supreme Court, the conviction becomes final 90 days after
the New York Court of Appeals denies leave to appeal, *i.e.*, when the time for seeking Supreme Court certiorari has
expired.  *Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).
However, the federal habeas statute tolls the limitations period for "[t]he time during which a properly filed
application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is
pending."  28 U.S.C. § 2244(d)(2).  From my review of the file, it appears Mitchell's conviction became final on
September 8, 2010, *i.e.*, 90 days after the New York Court of Appeals denied him leave to appeal on June 10, 2010.
Mitchell therefore had until September 8, 2011 to file a timely federal habeas opinion.  Mitchell filed the instant
petition on May 3, 2011.  *See* Pet. at 29.

of his claims. *Rhines v. Weber*, 544 U.S. 269, 277 (2005). However, the court should only do so where it "determines there was good cause for the petitioner's failure to exhaust" and the claim is not "plainly meritless." *Id*. A federal court must otherwise dismiss a mixed petition in its entirety on exhaustion grounds, *see Rose v. Lundy*, 455 U.S. 509 (1982), or allow the petitioner to amend the petition to withdraw the unexhausted claims, *Rhines*, 544 U.S. at 278. A federal court may also deny a mixed petition on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); *see also Pratt v. Greiner*, 306 F.3d 1190, 1197 (2d Cir. 2002).

Even if a claim in a federal habeas petition has not been exhausted, a federal court may deem it exhausted if it determines there are no avenues available in the state judicial system for reviewing the claim. *See* 28 U.S.C. §§ 2254(b)(1)(A)-(B) ("An application for a writ of habeas corpus . . . shall not be granted unless . . . the applicant has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process . . . ."); *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) ("When a claim has never been presented to a state court, a federal court may theoretically find that there is an absence of available State corrective process if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile."). But this "apparent salve . . . proves to be cold comfort to most petitioners" because the finding that the claims can no longer be exhausted requires the federal court to deem the claims procedurally defaulted. *Aparicio*, 269 F. 3d at 90. A federal habeas court may review a procedurally defaulted claim on the merits only if the petitioner can demonstrate cause and actual prejudice, or that failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

2. *Adequate and Independent State Ground Doctrine*

A federal habeas court may not "review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Walker v. Martin*, 131 S.Ct. 1120, 1127 (2011) (quoting *Coleman*, 501 U.S. at 729 (internal quotation marks and alterations omitted); *Harris v. Reed*, 489 U.S. 255, 261-62 (1989). The adequate and independent state ground doctrine, like the exhaustion requirement, is "grounded in concerns of comity and federalism." *Coleman*, 501 U.S. at 730. Without this doctrine, "habeas would offer state prisoners whose custody was supported by independent and adequate state grounds . . . a means to undermine the State's interest in enforcing its laws." *Id.* at 730-31.

A state procedural default qualifies as an adequate and independent ground and will preclude federal habeas review "unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris*, 489 U.S. at 262; *accord Coleman*, 501 U.S. at 750. This holds true any time "a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990); *accord Harris*, 489 U.S. at 264 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding.") (emphasis in original); *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996). Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent state ground doctrine "curtails reconsideration of the federal issue on federal habeas." *Harris*, 489 U.S. at 264 n.10; *but see Lee v. Kemna*, 534 U.S. 362 (2002) (recognizing that "[t]here are . . . exceptional cases in which

exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question").

### 3. *AEDPA Deference to Merits Decisions*

A federal habeas court may grant relief "with respect to a[ ] claim that was adjudicated on the merits in State court proceedings" only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence in the State court proceeding."[9] 28 U.S.C. § 2254(d). In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence. *Id.* § 2254(e)(1). AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *See Harrington v. Richter*, 131 S. Ct. 770, 785 (2011); *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court

---

[9] This limitation on relief is frequently referred to as "AEDPA deference." *E.g.*, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011); *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2265 (2010); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

"identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* Elaborating on the "unreasonable application" standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Richter*, 131 S. Ct. at 786 (2011).

B.    *Mitchell's Asserted Claims for Relief*

1.    *Insufficiency of the Evidence*

a.    *Robbery in the First Degree*

Mitchell claims that the evidence presented at trial was insufficient to convict him of robbery in the first degree because there was no evidence that he intended to steal anything from Stryker at the time that he shot him.[10]  In his petition, Mitchell states, "There was no intent to steal anything from Richard and Richard gave me those items after he was accidentally shot. . . . In fact, Richard went in to his own pocket, took off his watch and bracelet, and gave it to me after he had been accidentally shot."  Pet. at 16.  Mitchell further states,

> There is no way I would intentionally rob him or anyone else.  I never put my hands in his pocket or took his belonging [sic] off his wrist.  He did all that. . . .  Richard had a brief case with him.  If I wanted to steal something, it would be his briefcase because he most likely had business checks inside and I could have made him write me a check for the money that he owed me.  It is funny that no one mentioned that he had a briefcase in his possession.

---

[10]    Although Mitchell raised both a legal insufficiency claim and a weight of the evidence claim on direct appeal, only the legal insufficiency claim is cognizable on federal habeas review.  "A writ of habeas corpus cannot be used to review the weight of evidence . . . ." *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922), *aff'd*, 263 U.S. 255 (1923); *see also Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for [a writ of habeas corpus].").

Pet. at 18.  Finally, Mitchell argues, "I did not see it as stealing.  I just assumed that since he owed me money he was giving me something."  Pet. at 19.

Mitchell exhausted this claim in his direct appeal.  *See* Def's App. Br. at 17-20.  The Appellate Division denied it on the grounds that it was unpreserved for appellate review, and that in any event, the evidence supporting Mitchell's robbery convictions was legally sufficient.  *Mitchell*, 895 N.Y.S.2d at 872.  This ruling, which finds the claim procedurally defaulted, constitutes an independent and adequate state law ground barring federal habeas review.  Judging from the citations in the Appellate Division's opinion, it is evident that the court found the claim was unpreserved based on New York's contemporaneous objection rule, which requires "that a party seeking to preserve a claim of error at trial must lodge a protest to the objectionable ruling 'at the time of such ruling . . . or at any subsequent time when the [trial] court had an opportunity of effectively changing the same.'"  *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting N.Y. Criminal Procedure Law § 470.05(2)).  New York's contemporaneous objection rule is both independent and adequate, *id.*; *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999), precluding consideration of a legal insufficiency claim where trial counsel never specifically challenged the sufficiency of the evidence in the trial court, *see Quinones v. Ercole*, 310 F. App'x 434, 436 (2d Cir. 2009); *King v. Artuz*, 259 F. App'x 346, 347 (2d Cir. 2008).  Mitchell has not demonstrated any cause or prejudice for this procedural default, or shown that my failure to consider this federal claim will result in a fundamental miscarriage of justice.  Thus, I am bound to deny this claim without considering its merits.

Nonetheless, even if I were to reach the merits of the claim, I would deny it.  Under New York law, robbery in the first-degree is defined as the forcible stealing of property in which, "in the course of the commission of the crime or of immediate flight therefrom," the

defendant, *inter alia*, "[c]auses serious physical injury to any person who is not a participant in the crime," "[i]s armed with a deadly weapon," or "[u]ses or threatens the immediate use of a dangerous instrument."  N.Y. Penal Law § 160.15.  Robbery requires that the defendant have an intent to steal at or before the time he or she applies force.  *People v. Smith*, 79 N.Y.2d 309, 310, 312 (N.Y. 1992) (holding that a robbery defendant must use or threaten force with the "conscious objective" of accomplishing theft); *People v. Cochran*, 782 N.Y.S.2d 74 (N.Y. App. Div. 2004); N.Y. Penal Law § 160.00 (defining robbery as forcible stealing where the force is used "for the purpose" of preventing or overcoming resistance to the taking of property or compelling someone to deliver up their property).  Accordingly, where force is used against a victim and a theft occurs only as an "afterthought" to the use of force, no robbery occurs.  *See People v. Stewart*, 869 N.Y.S.2d 423, 424 (N.Y. App. Div. 2008).

Viewed in the light most favorable to the prosecution, the evidence presented at trial permitted the jury to find the following.[11]  Mitchell brought a loaded gun with him to meet with Stryker.  Even though he had an appointment to meet with Stryker at his office at noon, Mitchell waited in a minivan outside Stryker's home for two hours that morning.  When Stryker came outside with his wife and child, Mitchell convinced Stryker to let him ride in Stryker's car to the office, while the minivan followed them.  Mitchell got upset and claimed Stryker owed him money, which Stryker denied.  Mitchell then pulled out the gun and shot Stryker in the arm.  When asked why he had shot him, Mitchell responded, "Listen, I need money."  Mitchell then demanded and forcibly removed Stryker's wallet, watch, and bracelet.  After threatening to kill Stryker if he called the police, and telling Stryker he had 10 to 15 days to come up with another

---

[11]     *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) ("[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.  But . . . the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original).

$30,000 or $40,000, he escaped to the waiting minivan and disappeared down the street. This evidence was legally sufficient to permit the jury to conclude that the essential elements of robbery in the first degree had been proven beyond a reasonable doubt. Accordingly, this claim is denied.

b.    *Assault*

Mitchell also claims that the evidence presented at trial was insufficient to convict him of assault in the first degree because there was no evidence that he acted with intent to cause serious physical injury to Stryker. In his petition, Mitchell states,

> My intentions was [sic] never to shot [sic] Mr. Stryker or to take his belonging [sic] when I asked him to give me my money. . . . I had already accidentally shot Mr. Stryker in his arm. I believe that the weapon miss-fired [sic]. . . . I was not in my right state of mind and now believe that I was suffering from a mental breakdown or disorder. I should have never brought a weapon[;] I just wanted to scare him. I brought the weapon only for my protection.

Pet. at 19-20. Mitchell further states, "The events that took place were accidental. Richard and I were very good friends. I would never intentionally harm anyone[] [f]or any amount of money." Pet. at 23. He concludes that, "The assault charge should be reduced because it was negligence not an intentional act." Pet. at 28.

This claim is unexhausted, as Mitchell failed to raise it in his direct appeal. But because I find it to be "plainly meritless," I dismiss it on the merits. A person is guilty of assault in the first degree when, "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument." N.Y. Penal Law § 120.10. Under New York law, the element of intent is rarely proved by an explicit expression of culpability, *People v. Barnes*, 50 N.Y.2d 381 (1980), and may be inferred from the act itself or from the defendant's conduct, *see People v. Castillo*, 47 N.Y.2d 270, 277

(1979); *People v. Bracey*, 41 N.Y.2d 296 (1977). Viewed in the light most favorable to the prosecution, the evidence presented at trial permitted the jury to find the following. Mitchell brought a loaded gun with him to confront Stryker. He intentionally removed the gun from his briefcase. He fired the gun at Stryker. There was no evidence to suggest the gun had misfired. To the contrary, the evidence permitted the jury to conclude that after shooting Stryker, Mitchell proceeded to take his wallet, watch, and bracelet, and then left him in the car. This evidence was legally sufficient for the jury to find that the government had proven beyond a reasonable doubt that Mitchell acted with intent to cause serious physical injury to Stryker. Accordingly, this claim is denied, notwithstanding Mitchell's failure to exhaust.

2.     *Prosecutorial Misconduct*

Mitchell argues that the prosecutor committed misconduct in three ways: (1) she did not call three of the four arresting officers to testify; (2) she did not inform the jury that Mitchell was very ill and suffering from gastric cancer; (3) she vouched for her own case and twice accused Mitchell of "smiling" during her summation. Pet. at 13.

This claim is exhausted, as Mitchell raised it in his direct appeal. *See* Def's App. Br. at 28-30. The Appellate Division denied it on the merits, ruling: "The defendant's remaining contention is without merit." *See Mitchell*, 895 N.Y.S.2d at 873. Accordingly, I may grant habeas relief only if its determination was contrary to or involved an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

The appropriate standard of review for a habeas corpus claim alleging prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Floyd v. Meachum*, 907 F.3d 347, 353 (2d Cir. 1998) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). The petitioner must demonstrate that the alleged

misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 132 S.Ct. 2148, 2143 (2012) (quoting *Darden*, 477 U.S. at 181). The court must look at the totality of the circumstances in deciding whether the egregiousness of the prosecutor's alleged misconduct justifies relief. *United States v. Young*, 470 U.S. 1, 11-12 (1985) (noting the importance of context, including defense counsel's conduct). In the Second Circuit, this inquiry includes three factors: (1) the severity of the prosecutor's misconduct, (2) any curative measures taken by the court; and (3) the certainty of the conviction without the prosecutor's comments. *See, e.g.*, *United States v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1995); *Bentley*, 41 F.3d at 824; *Floyd*, 907 F.2d at 355. Standing alone, prosecutorial misconduct is insufficient to overturn a conviction. *Duran v. Miller*, 322 F. Supp. 2d 251, 259 (E.D.N.Y. 2004).

      The state called three law enforcement officers as witnesses: (1) New York City Police Officer Donna Brunner, who, together with her partner (who was on maternity leave at the time of trial), responded to the scene at 188th Street and Jamaica Avenue and secured the vehicle after Stryker was taken to the hospital, Tr. 345-51 (Brunner Test.); (2) New York City Police Officer John McEnroe, who responded to the scene, took photographs of the relevant intersections and Stryker's vehicle, and recovered the clothes that the medics had cut off Stryker's body in the car, Tr. 356-77 (McEnroe Test.); and (3) New York City Police Detective George Negron, who responded to the scene, took a statement from Stryker at the hospital, and arrested Mitchell on February 7, 2006, Tr. 377-94 (Negron Test.). The parties also stipulated into evidence the notes recording Stryker's statement describing his assailant as an unknown stranger, taken at the scene by New York Police Detective Culpeper, who was unavailable at the

time of trial (394-95).  Mitchell's trial counsel agreed to the stipulation, saying "I have spoken with my client.  Upon speaking to him, he's satisfied with that stipulation" (395).

The government has no obligation to call every law enforcement officer that was involved in the case to testify.  *Cf. Old Chief v. United States*, 519 U.S. 172, 186-87 (1997) ("[T]he prosecution is entitled to prove its case by evidence of its own choice, [and] a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.").  Mitchell does not even indicate which officers he believes should have testified but did not.  To the extent Mitchell believes all of the arresting officers should have testified, I note that Mitchell's arrest was not even at issue during the trial.  In short, Mitchell fails to state a claim of prosecutorial misconduct based on the state's failure to call certain arresting officers to testify.

Similarly, the prosecution had no obligation to disclose to the jury that Mitchell was suffering from gastric cancer.  If Mitchell wanted to impart such information to the jury, he was free to present it during his defense, assuming the evidence was relevant and comported with all other rules of evidence.  Indeed, Mitchell's lawyer did introduce evidence that Mitchell had been hospitalized in the fall of 2005 through his cross-examination of Shawn Bostick.  Tr. 334-35 (Bostick Test.).  Mitchell's lawyer also tried but failed to introduce evidence of Mitchell's health condition through direct examination of Mitchell's brother, Jeffrey Mitchell.  Tr. 434 (J. Mitchell Test.).  In short, the prosecutor committed no misconduct in failing to inform the jury that Mitchell had been diagnosed with cancer.

With respect to the prosecutor's summation, Mitchell does not specify which of the prosecutor's comments he believes constitute inappropriate "vouching."  Assuming Mitchell means to incorporate the arguments he made in support of his claim on direct appeal, Mitchell

contends the government inappropriately vouched for its case by saying: "I submit to you, ladies and gentlemen, there is absolutely no reason to doubt that the defendant is guilty of these crimes. This is not a complicated case. This is extremely straight forward." Tr. 483. The prosecutor also allegedly committed misconduct by stating that she was "at a loss" and did not "know what to tell you about" the defense witnesses, Tr. 481; urging the jury to "keep your eye on the ball" and "[f]ocus" instead of getting "distracted" by defense counsel, Tr. 480-81; and mischaracterizing defense counsel's argument by stating, "Mr. Russell submits that this case comes down to one witness[;] [t]he rest of the witnesses are just a horse and pony show that I put on for you," Tr. 476-77.

Prosecutors should generally "avoid interjecting their personal beliefs into their summations or vouching for their witnesses' truthfulness." *United States v. Rivera*, 22 F.3d 430, 437 (2d Cir. 1994) (internal quotation marks, citations, and alterations omitted). "The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant . . . ; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985); *see also United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) ("Attorney statements vouching for the credibility of witnesses are generally improper because they 'imply the existence of extraneous proof.'" (quoting *Rivera*, 22 F.3d at 438 (internal quotation marks and alterations omitted))). However, statements in which the prosecutor simply "submits" certain credibility conclusions for jury consideration do not qualify as vouching. *United States v. Newton*, 369 F.3d 659, 681-82 (2d Cir. 2004).

Similarly, when the context of the prosecutor's statement does not suggest that she has "special knowledge of facts not before the jury," but rather directs the jury's attention to the evidence supporting her contention, the statement is not improper. *Perez*, 144 F.3d at 210.

The prosecutor framed her statement that "there is absolutely no reason to doubt that the defendant is guilty of these crimes" by using the words "I submit." Further, she immediately followed up her claim that the case was "straight forward" by stating that "[t]he legally permissible evidence points in one direction and one direction only, . . . that the defendant is guilty." Tr. 483. Thus, the context of her statement clearly indicates that she was asking the jury to base its decision on the evidence that had been admitted at trial. Moreover, her statements asking the jury to "[f]ocus" and not be "distracted," Tr. 480, specifically instructed the jury not to be distracted even by some of the evidence that the government put on (about the Sterling Place real estate transaction), Tr. 481. She followed up these comments by telling the jury that it would "need to determine whether or not the defendant intended to cause serious physical injury to Richard Stryker," and went through the circumstantial evidence that had been presented at trial from which the jury could infer such intent. Tr. 481. Far from being improper, the prosecutor's statements commented directly on the evidence and were entirely appropriate.

Mitchell also objects to the prosecutor's adverse comments during summation regarding Mitchell's demeanor. She began her summation by stating, "I told you that Richard Stryker was shot and robbed and I told you that the man that did it is sitting right here smiling. I don't know what's so funny. This is a serious case. Somebody was shot." Tr. 460. She concluded her summation by noting that "Richard Stryker was shot and robbed and the man that did it is sitting right there still smiling." Tr. 483. Some courts have found that it is improper for the government to comment adversely about a non-testifying criminal defendant's courtroom

demeanor on the theory that it impairs his Fifth Amendment right against self-incrimination and his due process right not to be convicted except on the basis of evidence adduced at trial, and violates the prohibition on introducing character evidence of the accused unless he places it in issue. *See, e.g.*, *United States v. Schuler*, 813 F.2d 978, 980-81 (9th Cir. 1987). Other courts have recognized that a prosecutor's comments about a non-testifying defendant's behavior in the presence of the jury do not necessarily implicate the defendant's Fifth Amendment right and may be permissible. *See Maiello v. Edwards*, 1998 WL 230956, at *5 (S.D.N.Y. May 7, 1998) (citing cases).

Regardless of whether the government's comments regarding Mitchell's "smiling" were inappropriate, they did not result in "substantial prejudice" to Mitchell so as to deprive him of a fair trial. *See Bautista*, 23 F.3d at 732. The jury was free to observe on its own whether Mitchell was in fact smiling, and may have drawn inferences based on that conduct even without the government's suggestion. Further, the defense had warned the jury of this potential problem during voir dire, stating, "During this whole process you might have seen Mr. Mitchell laugh a little bit. If you laugh it doesn't mean you don't take this case seriously. It doesn't mean he doesn't have a worry in the world. It's just people deal with things differently." Tr. 161. Especially in light of the defense counsel's remarks, the prosecutor's comments did not substantially prejudice Mitchell. Moreover, the evidence of Mitchell's guilt presented at trial was powerful enough to render the purported impropriety of these comments harmless. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (federal habeas relief only warranted where error had a "substantial and injurious effect" on petitioner's conviction (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993))); *see also Wood v. Ercole*, 644 F.3d 83, 93-94 (2d Cir. 2011).

3.    Brady *Violation*

Mitchell claims that "the prosecutor withheld evidence," because "[t]he 911 tapes were not submitted to defense attorney." Pet. at 13. This claim is unexhausted because Mitchell did not present it on direct appeal. Nonetheless, I find it "plainly meritless" and therefore dismiss it on the merits.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), due process requires that the prosecution disclose evidence favorable and material to the defendant's case. *Id.* at 87. A petitioner establishes a *Brady* violation where the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different result. *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

If the 911 tape recorded Stryker as saying he could not identify the perpetrator of the crime, the tape would have been favorable and material. But I conclude that there is no reasonable probability that disclosure of the 911 tape would have produced a different result at Mitchell's trial. The state did disclose to the defense a "Sprint report," which includes a written transcription of the 911 call and the 911 operator's communication with the police dispatcher in code. *See* Def. Opp. Pet. 24, ECF No. 7. The Sprint report indicates that Stryker informed the 911 operator that he could not describe the perpetrator other than to say that he was a black man. *Id.* On direct and cross-examination, Stryker himself admitted that he had initially told the police that he could not identify his attacker. Tr. 261-63, 296-97, 301, 306-09 (Stryker Test.). And the defense successfully admitted Detective Culpeper's notes into evidence, which noted that Stryker described his assailant as an unknown black man of vague description. Tr. 396 (Stryker Test.). Although the prosecution should have turned over the 911 tape of the incident, the exculpatory evidence on the tape was cumulative of the evidence presented at trial and thus

there is no reasonable probability that its disclosure would have produced a different result. Accordingly, this claim is denied, notwithstanding Mitchell's failure to exhaust.

4.    *Excessive Sentence*

Mitchell claims that his sentence of 12 years was excessive in light of several factors. At the time of the offense, he was a "46[] year old man with 'No Criminal Record.'" Pet. at 10. He had a "very long work history" of 37 years, and had always been a "tax-paying citizen." Pet. at 10, 22. He had just been diagnosed with "malignant gastric cancer" and had been given less than a year to live if he did not have surgery "as soon as possible." Pet. at 22-23. As part of his cancer treatment, he was given Demerol for the pain, which induced a relapse of his cocaine addiction. Pet. at 23. Because of his extreme medical illness, the "panic[]" he experienced from his terminal diagnosis, the side effects he suffered from his cancer treatment, and his cocaine addiction relapse, he was "not mentally stable" at the time of the offense. Pet. at 23.

Although New York state recognizes a claim for relief on direct appeal where a sentence imposed, "though legal, was unduly harsh or severe," N.Y.C.P.L. § 470.15(6)(b), no such claim exists under federal law. To state a claim for relief under federal law, Mitchell's sentence must be cruel and unusual under the Eighth Amendment. Under well-settled federal constitutional law, there is no claim for cruel and unusual punishment where the sentence is within the range prescribed by state law. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992).

Mitchell's convictions for first-degree robbery and first-degree assault, both class B violent felony offenses, subjected him to a maximum determinate prison term of 25 years for each crime. *See* N.Y. Penal Law § 70.02(3)(b). At sentencing, the government requested a total sentence of 20 years of incarceration. Sentencing Tr. 2. The court sentenced Mitchell to

concurrent terms of 12 years of incarceration.  Sentencing Tr. 11.  Mitchell's sentence was thus

comfortably within statutory limits and presents no Eighth Amendment claim.  Accordingly, this

claim is denied.

5. *Ineffective Assistance by Pre-Trial Counsel in Plea Negotiations*

Mitchell claims that his pre-trial counsel was ineffective in failing to advise him

properly about the state's plea offers.  In his petition, Mitchell states,

> [T]he prosecutor offered defendant a Plea Offer of (2) years[;] Mr.
> [Angelo] Marino [Mitchell's second pre-trial lawyer] informed
> defendant of the offer but never asked if defendant understood
> what an offer entails.  Nor did Mr. Marino give defendant or his
> family a copy of this Plea Offer.  Mr. Marino did say that he would
> try to get the offer down to (1) year.  Mr. Marino never 'Advised'
> defendant to take this offer[,] only insisting that defendant agree
> with no time to think about it or . . . ever explaining what an offer
> is or that it is just (10) months to a year or that the time is minus
> the time that the defendant has been detained.

Pet. at 7.  Mitchell states, "I would have accepted the very first 'Plea Offer' of (2) years if

'Advised' by counselor."  Pet. at 28.  Mitchell later complains of "[t]he failure of my attorneys . .

. to 'Advise' defendant of the (2) different Plea Offers[]."  Pet. at 23.  He further states,

"Honorable Judge Kron offered defendant (5) years o[n] the record right in front of Mr. Russell

[Mitchell's third lawyer] and he chose to remain quiet never 'Advising' defendant to [acc]ept the

plea offer."  Pet. at 9.

At the time Mitchell filed this petition, he had not raised this claim on direct

appeal or in any collateral proceedings.  Because I concluded that this claim was not "plainly

meritless," *see Rhines*, 544 U.S. at 277, I stayed this petition to allow Mitchell to pursue

collateral proceedings in state court to develop the factual basis of this claim.  Order Staying

Case, Dec. 6, 2011.  On January 14, 2013 the Supreme Court of Queens County denied

Mitchell's § 440.10 motion. Decision and Order, *People v. Mitchell*, No. 1726-06 (N.Y. Sup. Ct. Jan. 14, 2013). The state court found Mitchell's claim meritless, holding:

> Defendant's claim that both of his prior attorneys failed to properly advise him of advantageous plea offers is unsubstantiated and was directly contradicted by both attorneys during the hearing. Defendant admits in his motion that his first attorney, Mr. Marino, did convey to him the People's offer of two years. Defendant also admits that he was equally aware of the Court's offer of five years made to him in the presence of counsel, Mr. Russell. The Court record indicates that between the periods of March 6, 2007, and May 29, 2007, Mr. Russell had supplied the People with defendant's medical records in an effort to persuade the People to make an offer allowing defendant to plead guilty to a reduced charge. Defendant's attorney has provided an affidavit from an associate of his firm which indicates that she spoke to Mr. Marino and to Mr. Russell and that each of them refuted defendant's current claim. The factors surrounding any plea negotiations were explored at a hearing before the court. The court credits the testimony of Mr. Russell and Mr. Marino and finds that any plea offers were conveyed to defendant by them. Defendant's choice to reject such offers after being advised of the implications including the possible prison term he faced if convicted at trial were voluntarily made by him after being fully apprised of the seriousness of the charges he faced. . . . This court is satisfied that the attorneys provided effective representation to defendant at all times including, but not limited to, during the plea process as well as the trial.

*Id.* at 9-10.

To establish a claim of ineffective assistance of counsel under the federal constitution, a petitioner must show (1) that his counsel supplied deficient representation, and (2) that the petitioner suffered prejudice as a result of that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

the Sixth Amendment.'" *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 687). To establish prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

In *Boria v. Keane*, the Second Circuit considered the ineffectiveness prong of the *Strickland* test in circumstances where defense counsel fails to discuss the advisability of accepting a plea offer with the defendant. 99 F.3d 492 (2d Cir. 1996). Guided by *Strickland*, it looked to "'[p]revailing norms of practice as reflected in American Bar Association ["ABA"] standards' as guides ' to determining what is reasonable," *id*. at 496 (quoting *Strickland*, 466 U.S. at 688), and found that standard to be that "[a] defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable," *id*. at 496 (quoting ABA, Model Code of Professional Responsibility, Ethical Consideration 7-7 (1992)); *see also Missouri v. Frye*, 132 S.Ct. 1399, 1408 (2012) ("The American Bar Association recommends defense counsel 'promptly communicate and *explain* to the defendant all plea offers made by the prosecuting attorney,' and this standard has been adopted by numerous state and federal courts over the last 30 years.") (citing ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2(a) (3d ed. 1999)) (emphasis added). Accordingly, "[d]efense counsel have a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003) (citing *Boria*, 99 F.3d at 498); *Boria*, 99 F.3d at 497 ("Effective assistance of counsel includes counsel's informed opinion as to what pleas should be entered.") (citing *United States v. Villar*, 416 F.Supp. 887, 889 (S.D.N.Y. 1976)).

The Supreme Court addressed the prejudice prong of the *Strickland* test in circumstances "where ineffective assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing trial" in *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012).[12] It held that "[i]n the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Id*. (citing *Frye*, 132 S.Ct. at 1388-89). Specifically,

> [i]n these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id*. at 1385.

In his supplemental briefing on this claim, Mitchell focuses on one particular plea offer where he alleges he received ineffective assistance of counsel. Just prior to jury selection, the trial court spoke with Mitchell off the record regarding a seven-year plea that the state had offered and Mitchell had rejected. Mitchell Suppl. Mem. in Supp. Pet. 13, ECF No. 20; Resp't Suppl. Mem. in Opp. Pet. 23-24, ECF No. 23. The trial court informed Mitchell that while the

---

[12]     The parties in *Lafler* agreed that defense counsel's performance met the ineffective prong of the *Strickland* test. In a companion case, *Missouri v. Frye*, 132 S.Ct. 1399 (2012), the Supreme Court considered the application of the ineffective prong in circumstances where "defense counsel did not inform the defendant of the plea offer; and after the offer lapsed the defendant still pleaded guilty, but on more severe terms." *Lafler*, 132 S.Ct. at 1383. The Court held that "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." 132 S.Ct. at 1408. Mitchell's claim for ineffective assistance of pre-trial counsel is not based on the allegation that his pre-trial counsel failed to communicate plea offers to him. Rather, he asserts that his pre-trial counsel "failed to adequately advise him regarding pretrial plea offers." Mitchell Suppl. Mem. in Supp. Pet. 1, ECF No. 20. Therefore, *Frye* is not applicable to this case.

state's offer was currently seven years, the court was willing to offer him five years.  *Id*.

Mitchell claims that his then-counsel, Royce Russell, "was silent" and

> did not stop the proceedings at that point to advise [him] of whether or not to accept the five-year plea deal proposed by the judge, nor did he advise [him] of the strength of the prosecution's case or explain to him how much of a five-year sentence he would actually serve.

Mitchell Suppl. Mem. in Supp. Pet. 13.  Mitchell argues that he "therefore did not accept the five-year offer and stated, 'I am not guilty,'" but had he been advised by Russell, he "would have accepted the offer and been willing to admit his guilt."  *Id*.

In its decision to deny Mitchell's § 440.10 motion, the state court credited the testimony of Russell.  Decision and Order, *People v. Mitchell*, No. 1726-06, at 10 (N.Y. Sup. Ct. Jan. 14, 2013).  On direct examination, Russell testified that when he was retained he discussed with Mitchell his efforts to obtain a plea offer and the consequences if Mitchell were to go to trial and lose, including his minimum and maximum sentencing exposure (which "[c]ould be a double digit sentence").  § 440.10 Hearing Tr. 9:13-18 (Russell Test.).  Russell also testified that he explained to Mitchell that his was "basically a one witness type of case" – *i.e.*, "your word against the victim's word."  § 440.10 Hearing Tr. 10:23-25 (Russell Test.).  Russell then testified that he conveyed the state's seven-year plea offer to Mitchell.  § 440.10 Hearing Tr. 11:11-17 (Russell Test.).  He stated that when he conveyed that offer, he explained to Mitchell that "the offer is probably not going to be lower."  § 440.10 Hearing Tr. 11:23-25 (Russell Test.).  He testified that Mitchell's reaction was that "[h]e wanted to proceed with trial" and expressed no interest in accepting the offer.  § 440.10 Hearing Tr. 12:7-20 (Russell Test.).  He explained that

Mitchell "professed his innocence . . . and so he wanted to go to trial."[13] § 440.10 Hearing Tr. 13:1-4 (Russell Test.).

Russell testified that on the first day of trial, the court "explained to Mr. Mitchell that the People are offering seven years, [but the] Court will offer five years." § 440.10 Hearing Tr. 17:14-20 (Russell Test.). Russell denied that he stood silent after the court made this offer. § 440.10 Hearing Tr. 19:12-14 (Russell Test.). He testified that after the trial court made that offer, he "reiterated that . . . the Court is going below what the prosecution is offering" and "this is your opportunity if you want to take hold of it to plead guilty and you will be sentenced to five years taking into consideration how much time you have already been in." § 440.10 Hearing Tr. 18:17-21 (Russell Test.). With respect to the last factor, Russell explained that he "conveyed to [Mitchell] that he has been in for a certain amount of period of time and that time would be accredited to him in reference to his time that he would not be sentenced." § 440.10 Hearing Tr. 18:24-19:2 (Russell Test.). Russell testified that Mitchell then rejected the offer. § 440.10 Hearing Tr. 20:18-20 (Russell Test.).

On cross-examination, Russell testified that his normal practice with clients is to explain the minimum and maximum sentencing exposure, plea offers from the DA, and what to expect at trial. § 440.10 Hearing Tr. 44:24-45:2 (Russell Test.). He had trouble, however, recalling with specificity as to whether he provided such explanations to Mitchell. § 440.10 Hearing Tr. 45-2-4 (Russell Test.). Russell also testified that he discussed the facts of the case with Mitchell but could not recall describing the evidence against Mitchell as "pretty strong or any other adjective around that." § 440.10 Hearing Tr. 46:11-14 (Russell Test.). Mitchell's

---

[13]    With respect to "professing his innocence," Russell clarified that Mitchell told him "that there was a struggle for the gun and that he didn't have the gun." § 440.10 Hearing Tr. 13:6-7 (Russell Test.).

counsel then proceeded to question him as to his philosophy regarding plea offers, producing the

following exchange:

> Q:      So in this case, you neither pushed a plea nor pushed a trial; is that fair?
>
> A:      I am struggling with the word "push."
>
> Q:      Recommended.  How's that?
>
> A:      I always – if anything – if any offer is conveyed to me, I have an obligation to convey it to my client and then I have an obligation and this case is no different to talk and educate them what that actually means in reference to whether they already have time in or what happens if they don't accept it, what the judge may or may not do as far as term of incarceration.
>
> . . .
>
> THE COURT:      I think the question is did you in terms of the strength of the case, this is what you're up against, this is your chance, this is – considering what you're up against, under the circumstances, I think it's a good idea to take the offer or not take the offer or simply the decision is yours.  You know, this is what you're up against.  There is possible defenses or anything else.  It's up to you.  What do you want to do?
>
> A:      We discuss defenses.  We discuss what the offers were. . . . We discuss what the offer was, seven versus five . . . .
>
> Q:      Let me circle around and just ask you if you remember definitively, did you make a recommendation to him whether or not he should accept the Court's plea offer?
>
> A:      I made a recommendation in that this number is lower.  It's mostly going to be lower than a number that you might be sentenced to if a jury comes back and convicts you.
>
> Q:      Okay.  So is it fair to conclude from that that you didn't recommend either that he take the offer or that he reject it?
>
> A:      I would say I recommend that he consider taking the offer.
>
> Q:      Well, when you say 'I say that' –

THE COURT:     Do you have a specific recollection of that?

A:     I don't have a specific recollection of that.

§ 440.10 Hearing Tr. 48:23-50:134 (Russell Test.).

The state court's decision denying Mitchell's § 440.10 motion found that Mitchell had chosen to reject the offer "after being advised of the implications including the possible prison term he faced if convicted at trial" and that Mitchell was "fully apprised of the seriousness of the charges he faced."  Decision and Order, *People v. Mitchell*, No. 1726-06, at 10 (N.Y. Sup. Ct. Jan. 14, 2013).  Mitchell's first argument in support of his claim is that the state court's decision constitutes an unreasonable determination of facts in light of the evidence presented at the hearing.  Specifically, Mitchell asserts that, in spite of Russell's testimony to the contrary, Mitchell's own testimony establishes that "when, on the eve of trial, the court bettered the prosecutor's last plea deal of seven years with an offer of five, Russell stood mute."  Mitchell Mem. in Supp. Pet. 31.

"Under 28 U.S.C. § 2254(e)(1), the fact-findings of the trial court are subject to a 'presumption of correctness,' a presumption that is particularly important when reviewing the trial court's assessment of witness credibility."  *Cotto v. Herbert*, 331 F.3d 217, 232 (2d Cir. 2003).  "On habeas review, the petitioner has the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'"  *Id*. (citing 28 U.S.C. § 2254(e)(1)).  Here, Mitchell challenges the state court's assessment of the relative credibility of his testimony versus Russell's testimony.  Given the extremely narrow scope of my review, I am not in a position to disturb the state court's finding that Russell's testimony was credible.  I conclude therefore that its finding that Russell did not stand silent during the trial court's five-year plea offer was not an

"unreasonable determination of the facts in light of the evidence presented" (*i.e.*, Russell's testimony to that effect).

Mitchell's next argument in support of his claim is that the state court's decision constitutes an unreasonable application of Supreme Court law because, even crediting Russell's testimony that he advised Mitchell regarding the five-year plea offer, his advice was constitutionally deficient. Mitchell Suppl. Mem. in Supp. Pet. 31-36. Mitchell asserts that Russell espoused "a policy of neutrality or no advice as to Mr. Mitchell, and in his practice generally, with respect to the acceptance or rejection of plea offers," ultimately leaving "the decision to accept or reject a plea" to the client. *Id*. at 32-33. Mitchell argues that such a "rationale – that it would ultimately be Mr. Mitchell's decision whether or not to accept a plea offer, did not absolve Russell of his responsibility to give his professional opinion that the offer should be accepted." *Id*. at 34. He continues that the failure to provide such an opinion – notwithstanding the state court's finding that Russell conveyed the offer and advised Mitchell of "the implications, including the possible prison term he faced if convicted at trial" – was objectively unreasonable and deprived Mitchell of constitutionally effective counsel. *Id*. at 34 (quoting Decision and Order, *People v. Mitchell*, No. 1726-06, at 9-10 (N.Y. Sup. Ct. Jan. 14, 2013)).

I am not convinced that the state court's determination, which relied on the testimony of Russell, was an unreasonable application of Supreme Court law. In fleshing out the application of *Strickland* to circumstances such as these, the Second Circuit has held that "[a] defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable." *Boria*, 99 F.3d at 496; *Pham*, 317 F.3d at 182 ("Defense counsel have a constitutional duty to give their clients professional advice on the

crucial decision of whether to accept a plea offer from the government.").  Here, Russell testified

that prior to the trial court's five-year offer, he had discussed with Mitchell his minimum and

maximum sentencing exposure were he to go to trial and lose.  He also testified that he and

Mitchell had discussed the configuration of the case as a swearing context between Mitchell and

Stryker.  Russell testified that at the time of the trial court's five-year offer, he spoke with

Mitchell about the plea, particularly emphasizing the time Mitchell had already served and how

that would be credited to his overall sentence.  Crediting this testimony, as I must, I do not find it

unreasonable for the state court to characterize Russell as having proffered "professional advice

on the crucial decision of whether to accept a plea offer from the government."  *Pham*, 317 F.3d

at 182.  Russell touched upon critical factors a defendant must consider when weighing such a

decision, including his minimum and maximum sentencing exposure, the evidence the state

would present at trial, and the amount of time Mitchell had already served.  Moreover, while

Russell waffled on whether he explicitly recommended that Mitchell take the offer, his testimony

was ambiguous enough that it would not have been outside the bounds of reasonableness for the

state court to have found that Russell did communicate such a recommendation to Mitchell.

 Mitchell relies heavily on *Carrion v. Smith*, 655 F. Supp. 2d 452 (S.D.N.Y. 2009)

in support of his position.  In *Carrion*, the district court held, after conducting its own

evidentiary hearing, that a petitioner did not receive effective assistance of counsel with regard to

a plea offer.  But *Carrion* is distinguishable from this case on multiple grounds.  First, in

*Carrion*, defense counsel had failed to inform petitioner of the sentencing exposure he faced if he

accepted the plea offer and if he did not.  644 F. Supp. 2d at 467.  Second, the *Carrion* court

noted that defense counsel "had *one* conversation with [petitioner] in which he described the

proposed plea as a 'good offer.'"  *Id*. at 468 (emphasis in original).  Here, Russell testified that

he spoke with Mitchell immediately following the court's five-year offer, but that he had also

spoken with Mitchell regarding the state's prior seven-year offer.  Moreover, Russell testified

that they discussed various factors touching upon the relative merits of both offers.  Finally,

defense counsel in *Carrion* admitted to "a strict 'no advice' policy, according to which he d[id]

not advise his clients as to the advisability of taking a plea, even when it is in their best interests

to do so."  *Id*. at 468-69.  Mitchell tries valiantly to paint Russell as espousing a similar "no

advice" policy, but Russell's testimony does not bear the weight of that argument.  *Compare id*.

at 461-62 (quoting defense counsel in *Carrion* as stating "I don't give specific advice, yes, you

should take the plea or, no, you should not take the plea . . . .") *with* § 440.10 Hearing Tr. 50:4-7

(Russell Test.) ("Q:  [I]s it fair to conclude . . . that you didn't recommend either that he take the

offer or that he reject it?  A:  "I would say I recommend that he consider taking that offer.").

      Finally, even if Mitchell were to prevail on the ineffectiveness prong of the

*Strickland* inquiry, he would still lose on the prejudice prong, as the record indicates that

Mitchell would not have taken the plea even if Russell had vigorously advised him to do so.

Marino testified that when he presented Mitchell with the two-year (and later one-and-a-half

year) plea offer prior to Mitchell's indictment, Mitchell "indicated . . . under no circumstances . .

. [w]as he taking a plea in this particular case."  § 440.10 Hearing Tr. 65:18-19 (Marino Test.);

*see also id*. at 66:14-17 ("A: [Mitchell] was adamant.  He was completely adamant. . . . No

matter what I told him, no matter how I explained it to him, he said I am not taking any time in

this particular case.  No way.").  Russell testified that Mitchell was similarly disinclined to

accepting a plea offer.  Russell testified that when he conveyed the seven-year offer to Mitchell,

Mitchell expressed no indication "that he was interested at all in accepting that offer."  § 440.10

Hearing Tr. 12:18-20.  Russell further testified that Mitchell "professed his innocence,"

specifically that "there was a struggle for the gun and that he didn't have the gun," and Russell indicated that Mitchell did not "sway[ ] from that and so he wanted to go to trial." § 440.10 Hearing Tr. 13:3-7. As to the five-year plea offer, Russell testified that Mitchell rejected it but didn't recall Mitchell explaining the reason for his rejection. But Mitchell's overall posture and reactions to prior plea offers throughout the pre-trial period strongly suggest that Mitchell was not open to accepting a plea offer, notwithstanding advice to do so by his counsel.

Accordingly, this claim is denied.[14]

6.      *Ineffective Assistance by Trial Counsel*

Mitchell complains of his representation by trial counsel on many fronts. First, he contends that his trial counsel did not seek a mental health examination for him, which would have supported a claim of incompetence to stand trial. Specifically, Mitchell states that his trial counsel "should have had defendant examined by a Psychiatrist because of all the [cancer-related] illnesses . . . and the side-effects suffered by the [cancer] treatment," and that "Mr. Russell failed to have defendant examined to see if he was competent." Pet. at 8.

Second, Mitchell implies that his trial counsel should have raised a diminished capacity defense, such as insanity, due to his deranged mental state from his cancer diagnosis,[15] or voluntary intoxication, due to his cocaine relapse. In his petition, Mitchell states,

---

[14]      To the extent that Mitchell also rests his ineffective assistance of counsel claim on the plea offers he received while represented by Amelio Marino, his pre-trial counsel prior to Russell, the claim is meritless. During the state court evidentiary hearing, Marino testified that he conveyed the state's plea offers to Mitchell. § 440.10 Hearing Tr. 65:17 (Marino Test.). He stated that he explained to Mitchell his minimum and maximum sentencing exposure if he were to go to trial and lose and the strengths and weaknesses of the case. § 440.10 Hearing Tr. 67:16-24, 69:2-7 (Marino Test.). He further stated that he explicitly recommended that Mitchell take the offers. § 440.10 Hearing Tr. 67:8-12 (Marino Test.). The state court found Marino's testimony credible, a determination to which I defer. Crediting this testimony, I conclude that Marino rendered effective assistance to Mitchell in advising him as to the plea offers.

[15]      Mitchell's medical records indicated that Mitchell was suffering from gastric cancer at the time of the incident. According to Mitchell's appellate brief, on January 26, 2006, three days before the crime, his doctor wrote in a report that Mitchell had an "advanced malignancy," that he was referring Mitchell to immediate surgery,

> Defendant would never intentionally harm or hurt anyone[;] that is
> not his character.  Defendant panicked.  Defendant felt like he only
> had a very short time to live. . . .  Defendant had surgery scheduled
> in (1) week [on February 7, 2006;] defendant was not sure if I was
> going to live thru the surgery because his father died on the
> operation table[] in 1982 at the young age of (44).

Pet. at 17.  He further states, "I was not in my right state of mind and now believe that I was

suffering from a mental breakdown or disorder," and "[m]y medical records should have been

available to show that I was suffering with many illnesses to prove that I was not in my right

state of mind due to those illnesses."  Pet. at 16, 20.  He also states, "My medical condition

played a major part on what happened to Richard and I was not mentally stable due to my

medical illnesses and substance abuse."  Pet. at 23.  He explains that he "was given 'Demerol'

for the pain [from cancer treatment] in November of 2005, and later that month I suffered a

relapse of my cocaine addiction."  Pet. at 23.

Third, Mitchell complains of his trial counsel's failure to present medical

evidence to the jury at trial that Mitchell was suffering from cancer, either at the time of the

crime or at the time of trial.  He writes, "My medical records should have been available to show

that I was suffering with many illnesses to prove that I was not in my right state of mind due to

those illnesses."  Pet. at 16.  He also says, "Mr. Russell . . . failed to have defendant['|s medical

records available for the court, he failed to call an expert witness or defendant['|s physician."

Pet. at 8.

Fourth, Mitchell contends that his trial counsel was deficient for failing to argue

that the state had not demonstrated his intent to rob or intent to harm.  Specifically, Mitchell

faults his trial counsel for not arguing that Mitchell viewed the items he took from Stryker as

---

and that "[t]he reality of [the situation] for the patient seems somewhat surreal."  *See* Def's Ap. Br. at 10 n.2.
However, sometime prior to Mitchell's direct appeal Mitchell learned that he had actually been misdiagnosed and
did not have cancer.  *Id.*

payment of a debt rather than stealing, *see* Pet. at 19 ("I just saw it as a payment of what he owed me. . . . I did not see it as stealing. I just assumed that since he owed me money he was giving me something."), and to point out that Mitchell did not steal Stryker's briefcase, which negated the intent to steal, *see* Pet. at 16 ("Richard had a brief case with him. If I wanted to steal something, it would be his briefcase because he most likely had business checks inside and I could have made him write me a check for the money that he owed me. It is funny that no one mentioned that he had a briefcase in his possession."). Mitchell also faults his trial counsel for failing to have Mitchell testify that the shooting was an accident, thereby negating the intent to cause harm necessary for assault. *See* Pet. at 19-20 ("My intentions was never to shot [sic] Mr. Stryker or to take his belonging [sic] when I asked him to give me my money. . . . I had already accidentally shot Mr. Stryker in his arm. I believe that the weapon miss-fired. . . . I should have never brought a weapon[;] I just wanted to scare him. I brought the weapon only for my protection.").

Finally, Mitchell asserts that his trial counsel did not prepare or encourage him to testify. He states, "[H]e [Russell] would state (3) different times to the defendant before the defendant was to testify saying, 'You know that you do not have to testify.' I assumed that he did not want me to testify." Pet. at 8. Mitchell states, "If I was advised properly I would have testif[ied]." Pet. at 10-11.

This claim is exhausted, as Mitchell raised it in his direct appeal. *See* Def's Ap. Br. at 20-27. The state court denied this claim on the merits, holding that "[t]he defendant was not deprived of the effective assistance of counsel, as the record reveals that defense counsel provided meaningful representation."[16] *Mitchell*, 895 N.Y.S.2d at 873.

---

[16] Mitchell also raised this claim in his § 440.10 motion on largely duplicative grounds, including that his trial counsel failed to raise a mental disease or defect defense and to call certain witnesses in his defense.

Even if Mitchell's counsel's performance was deficient, I conclude that Mitchell has failed to demonstrate prejudice under *Strickland*, that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Although Mitchell suggests he was distraught at the time of the crime, Mitchell provides no evidence of any mental disease or condition so serious that it could have supported an assertion of incompetence or a defense of insanity. And the evidence against Mitchell was overwhelming. The prosecution presented evidence that Stryker had been shot at close range on January 31, 2006, and that the bullet had entered his arm and chest. Both Stryker and his wife testified without any inconsistency that Mitchell had been waiting for Stryker outside his house that morning, and rode as the sole passenger in Stryker's car as Stryker drove away from his house that day. Several New York City police officers testified that Stryker was found shot in his car soon afterward. And Stryker himself testified that it was Mitchell who shot him and then took his wallet, watch, and bracelet. Given that Stryker had known Mitchell for six years, Stryker's ability to identify Mitchell was beyond impeachment.

The only weakness in the state's case was Stryker's initial reluctance to identify Mitchell as the perpetrator; however, Stryker's explanation that he was afraid of Mitchell was clearly credited by the jury. Indeed, the alternative story – that a stranger jumped into Stryker's car and robbed and shot him – is highly implausible, not least because it is unclear why Stryker would have wrongfully accused Mitchell of the crime. Nor is it any more plausible that Mitchell shot Stryker by accident, after which Stryker voluntarily offered Mitchell his valuables, whereupon Mitchell abandoned Stryker. In short, although Mitchell's defense suffered

The state court reviewing the § 440.10 motion again denied these claims on the merits. Mitchell's supplemental briefing addresses both his claim for ineffective assistance of by pre-trial counsel as well as his claim for ineffective assistance by trial counsel. I stayed this case so that Mitchell could pursue the former, not the latter, claim. Accordingly, my review of Mitchell's ineffective assistance of trial counsel claim does not consider the arguments raised by Mitchell on his § 440.10 motion or in his supplemental briefing to the court.

numerous infirmities, I conclude that his representation did not prejudice Mitchell. Accordingly, this claim is denied.

CONCLUSION

For the reasons stated above, Mitchell's petition for habeas corpus pursuant to 28 U.S.C. § 2254 is denied. Because Mitchell has failed to make a substantial showing that he was denied a constitutional right, a certificate of appealability shall not issue.

So ordered.

John Gleeson, U.S.D.J.

Dated: August 9, 2013
      Brooklyn, New York